**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| EDGECO. INC., | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 02-2624 (JAG) |
| | : | |
| FASTCAP, LLC, | : | |
| and PAUL AKERS, | : | |
| | : | |
| Defendants, | : | |
| | : | |
| | : | |
| FASTCAP, LLC, | : | **OPINION** |
| and PAUL AKERS, | : | |
| | : | |
| Counterclaimants, | : | |
| | : | |
| v. | : | |
| | : | |
| EDGECO. INC., | : | |
| | : | |
| Counterclaim Defendant. | : | |
| | : | |

**GREENAWAY, JR., U.S.D.J.**

This matter comes before this Court on Plaintiff/Counterclaim Defendant EdgeCo. Inc.'s

("EdgeCo.") motion seeking summary judgment on the grounds that its peel and stick screw

covers do not infringe claims 1-11 of United States Patent No. 5,997,229 ("the '229 Patent") and

a declaration that claims 13-16 of the '229 patent are invalid as anticipated by prior art.[1]

---

[1] Plaintiff/Counterclaim Defendant EdgeCo. also moved for the dismissal of Defendant
FastCap, LLC as a party in the action because FastCap, LLC, as a licensee of the '229 patent,

Defendants/Counterclaim Plaintiffs FastCap and Paul Akers (collectively, "FastCap") moved for summary judgment on the grounds that Plaintiff/Counterclaim Defendant EdgeCo. infringes claim 13 of the '229 patent.  Defendants/Counterclaimants FastCap also moved to strike the testimony of Arthur Jacob, Esq. and for dismissal of EdgeCo.'s seventh affirmative defense to patent invalidity alleging that the '229 patent is invalid because it is unenforceable.[2]

## BACKGROUND

This is a patent infringement suit in which Plaintiff/Counterclaim Defendant EdgeCo. seeks a declaration that its activities do not infringe the '229 patent.  The subject matter at issue is a disc-shaped screw cover ("generally planar cover member") with an adhesive back that is employed to cover screw holes, i.e., holes in the surface of furniture or other wood-based items, in an effort to eliminate the unsightly appearance of the screw hole and to create the appearance of an unmarred finish along the wood's surface.

**EdgeCo.'s EdgeBanding Techonology**

EdgeCo. is a Delaware corporation with its principal place of business in Fairfield, New Jersey.  EdgeCo. sells and distributes materials used in the assembling of furniture. (Pl./Countercl. Def. Mem. Supp. Partial Summ. J. at 3.)  EdgeCo.'s product lines include products that employ technology known as "edgebanding," in which a strip of veneer with an adhesive on

_____

lacked standing to bring claims under the patent-in-suit. (Pl./Countercl. Def. Mem. Supp. Partial Summ. J. at 15-16.)  On December 16, 2004, this Court entered an Order dismissing Defendant/Counterclaimant FastCap, LLC, pursuant to the parties' agreement by correspondence and FED. R. CIV. P. 41(a)(2).  While there is only one remaining Defendant, to avoid confusion, this Opinion adopts parties' plural form and reference designating the remaining Defendant/Counterclaimant Paul Akers as "FastCap."

[2] As reflected in this Court's Order, dated December 9, 2004, EdgeCo. voluntarily abandoned its seventh affirmative defense which alleged that the '229 patent is unenforceable.

2

one side is attached to a piece of wood to make the finish of the wood product appear seamless and to cover any marks or holes in the surface of the wood.  (Id.)  In October 2001, EdgeCo. expanded its product line to include "EeeZee Covers," pre-cut disc-shaped tabs derived from the same adhesive backed product as the edgebanding technology and intended to accomplish the same objective.  (Id.)  EdgeCo. marketed EeeZee Covers as a product to be used to "cover holes made by screws or other fasteners in the assembly of furniture . . . . to leave the impression of an unmarred surface, free of screw holes." (Id.)  EdgeCo. advertised the EeeZee Covers in trade journals and at certain trade shows.  (Id. at 4.)

The EeeZee Covers are sold attached by their adhesive side to a single sheet with thirty-five to fifty-two screw covers per sheet.  The instructions that accompany EeeZee Covers teach the following method: "(a) Bonding surface must be clean, dry and free of sawdust; (b) Remove EeeZee Cover from backing and position over the screw; (c) Apply EeeZee Cover with maximum pressure to assure maximum bond."  (Decl. Dennis Gleason, Ex. I.)

### *The FastCap®;*

The '229 patent, issued to Paul Akers on December 7, 1999, describes "an easy-to-use peel and stick screw cover device and method for quickly covering multiple screw holes in furniture, kitchen cabinets, etc." known as the FASTCAP®.  (Defs./Countercl. Pls.' Opp'n Pl. Mot. Summ. J. at 1.)  FastCap, LLC, a Washington state based limited liability company, has a license to sell and distribute the FASTCAP®.  (Compl. ¶¶ 3-6.)  The "Background of the Invention" section of the '229 patent explains that "[a] variety of people are involved in the woodworking industry . . . with varying degrees of skill," including people who "do not actually work in the woodworking art, but who will purchase items, such as desks, chairs, bookshelves,

etc." with pre-made components.  (Decl. Michael Cronen, Ex. A, '229 patent, col. 1, lines 20-29.)  When furniture items such as those described above are assembled, the individual preassembled pieces are joined with screws.  (Id.)  "After the screws are in place, all of these people (the professional woodworker, the amateur woodworker, and the person simply assembling a premade article) have a common problem, and that is how to cover the exposed heads of screws" that are countersunk.  (Id. at lines 31-35.)  The screwhead is flush with the surface of the assembled furniture, but exposed, creating an unsightly departure from the smooth, uniform material of the furniture surface. (Id. at 31-40.)

Independent Claim 1 and Claims 2-11 that depend therefrom set forth the method claims for the application of the FASTCAP®.  Independent Claim 13 and Claims 14-16 that depend therefrom set forth the product claims, i.e., "[a] generally planar cover member to cover an exposed fastener in a structure."  (Id. at col. 18, line 42- col. 20, line 4.)  Claim 12 recites the combination of the claimed method and product.  (Id. at col. 17-col. 18.)

Claim 1 recites the method as follows:

1.   A method of covering an exposed fastener in a structure where;
   i.   the structure has a structure surface
   ii.   a fastener, is positioned in the surface in a manner that there is a surface opening in the structure, said surface opening having a perimeter edge with a predetermined maximum edge to edge lateral dimensions; said method comprising
      a.   Providing a generally planar cover member comprising
         i.   An exposed surface on one side and a contact surface on opposite side, and a perimeter edge portion having lateral dimensions greater than corresponding lateral dimensions of the surface opening, said perimeter edge portion having a perimeter surface contact portion;
         ii.   An adhesive material located at least at a perimeter contact portion of the contact surface;
      b.   Applying the cover member to the structure surface to cover the surface opening so that the perimeter portion of the cover member is

4

properly positioned relative to the perimeter edge portion of the surface opening, and moving the cover member into engagement with the surface of the wood structure so that the perimeter contact portion of the cover member becomes bonded to at least a surface portion of the structure surrounding the surface opening;

    c.  Said cover member being sufficiently resilient and sufficiently resistant to bending so that in the application of the cover member to the structure surface, with the cover member being positioned so that with a first edge portion of the cover member being located at a first location of the structure surface near the perimeter edge of the surface opening, a second portion of the cover member may be grasped in a manner to manipulate the cover member to cause enough force to be transmitted from the second portion through the cover member to the second portion of the cover member to press the first portion of the cover member into engagement with the surface structure at the first location so that resistance to lateral movement of the first portion of the cover member at the first location is sufficiently great so that the cover member can be moved toward the structure surface into its proper position with the perimeter contact portion of the cover members surrounding the surface opening to cover the surface opening, and with the first portion of the cover member remaining at the first location to stabilize the cover member as it is moved to its covering position, said cover member having a reference deflection less than 1.0 inch and greater than zero. ('229 patent, col. 16, lines 12-62.)

Claim 13 recites the following:

13. A generally planar cover member to cover an exposed fastener in a structure where;
    i. The structure has a structure surface;
    ii. A fastener, such as a screw, is positioned in the structure in a manner that there is a surface opening in the structure, said surface opening having a perimeter edge with predetermined maximum edge to edge lateral dimensions; said method comprising
        a.  an exposed surface on one side, a contact surface on an opposite side, and a perimeter edge portion having lateral dimensions greater than said lateral dimensions;
        b.  an adhesive material located at least at a perimeter contact portion of the contact surface;
        c.  said cover member being sufficiently resistant to bending so that in the application of the cover member the cover member may be grasped in a manner to manipulate the cover member to cause enough force to be transmitted so

5

> that the cover member can be bent in being moved into its
> proper covering position and sufficiently resilient to be able
> to return to its original shape, said cover member having a
> reference deflection of less than 1.0 inch and greater than
> zero. ('229 patent, col. 18, lines 42-64.)

Claim 1 and Claim 13 teach the application of a "generally planar cover member" applied by positioning the adhesive cover over the screw hole, bending the cover member and adjusting the position of the cover member until it sufficiently covers the screw hole, and pressing the cover member over the top of the screw hole. ('229 patent, col. 16, lines 12-62; col. 18, lines 42-64.) The FASTCAP® is "oversized" compared to the screw hole. (Id.) "Because the FASTCAP® sticks to the furniture surface it need not contact the screw head . . . . [which] allows it to be used even if the head of the screw is countersunk well into the furniture surface." (Decl. Paul Akers at ¶ 4.) The claims teach a generally planar cover member with adhesive back that is applied by positioning and bonding the perimeter contact portion of the cover to the furniture surface, covering the opening created by a screw head. ('229 patent, col. 16, lines 41-50.) When the perimeter edge of the cover is "moved into engagement with the surface of the wood structure . . . . second portion of the cover member may be grasped" and manipulated to "press the first portion of the cover member into engagement with the surface structure." (Id.)

**<u>All Metal Stamping Peel and Stick Covers</u>**

In response to FastCap's accusations that EdgeCo.'s EeeZee Covers infringed the patent-in-suit, EdgeCo. notified FastCap that a third party, All Metal Stamping, Inc. ("All Metal"), had manufactured and distributed screw hole covers for seven years prior to the issue date of the '229 patent.

All Metal, a Wisconsin manufacturer of hardware for fire doors, published and distributed a catalog as early as 1992, advertising adhesive backed screw covers. (Decl. Jack Lasee at ¶¶ 1, 2; Ex. A.)  All Metal manufactures fire door hardware, including metal vision window panel frames, metal door edges and astragal, and acoustical door bottom seals.  (Id. at ¶ 2.)  All Metal wraps the window and door frames that it manufactures in a "veneer skin" and covers screw holes that result from the manufacturing process with pre-cut screw covers.  (Id. at ¶¶ 3, 4.)

The screw covers "plug[ ] the holes with the same veneer material that was die cut and removed from the window frame to expose the screw holes." (Id. at ¶ 6.)  The remaining holes in the veneer are approximately $\frac{1}{16}$th of an inch deep, equal to the thickness of the veneer.  (Id. at ¶ 5.)  The "die cut material has the same size diameter and depth as the hole in the veneer, it fits snugly into the hole left by the punch . . . . The plugs are thus sized to fill the holes like a dowel." (Id. at ¶ 6.)  In the event that die cut veneer is crushed "in the process of removing it from the screw holes in the window frames . . . . the removed veneer material is unusable as a plug" and All Metal supplies extra veneer "to plug the holes around the screw head."  (Id. at ¶ 7.)

**The Present Dispute**

On October 29, 2001, FastCap sent EdgeCo. a cease and desist letter, stating that the EeeZee Cover appeared to infringe the claims of the '229 patent. (Decl. Dennis Gleason at Exhibit D.)  The letter demanded that EdgeCo. terminate any infringing activity. (Id.)  EdgeCo.'s patent counsel, Arthur Jacob, investigated the matter. (Decl. Dennis Gleason at Ex. E.)  EdgeCo. responded in a letter dated November 15, 2001, stating that the EeeZee Covers were "identical in all significant aspects to [All Metal peel and stick screw covers] which have been on sale since as early as mid-1992" and were sold to Weyerhauser Co. of Marshfield, Wisconsin, and Mohawk

Flush Doors of South Bend, Indiana.  (Id.)  In its motion for partial summary judgment, EdgeCo. argues that the subject matter claimed in the '229 patent is rendered obvious by prior art, the All Metal screw covers, and therefore, the '229 patent is invalid.  EdgeCo. further argues that it does not infringe the "complicated thumb and forefinger snapping motion" of claims 1-11 of the '229 patent.

On August 15, 2002, FastCap filed a counterclaim seeking a declaration that EdgeCo. infringes the '229 patent, as well as, injunctive relief and damages for EdgeCo.'s willful acts of infringement.  (Def./Counterclaimant FastCap Answer, Counterclaim and Jury Demand, 4-7.)

Presently before this Court are EdgeCo.'s motion for partial summary judgment on non-infringement of claims 1-11 of the '229 patent and invalidity of claims 13-16 of the '229 patent; FastCap's motion for summary judgment of infringement and validity on its counterclaim; and FastCap's cross-motion to strike the testimony of Arthur Jacob, Esq.

For the reasons set forth below, this Court denies EdgeCo.'s motion for partial summary judgment on non-infringement and invalidity; grants FastCap's motion for summary judgment on validity and finds that EdgeCo. infringes claim 13 of the '229 patent; and (3) grants, in part, and denies, in part, FastCap's motion to strike the testimony of Arthur Jacob, Esq.

## STANDARD OF REVIEW

**A.**   ***Standard for Summary Judgment***

Summary judgment is appropriate under FED. R. CIV. P. 56(c) when the moving party demonstrates that there is no genuine issue of material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law.  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Orson, Inc. v. Miramax Film Corp., 79 F.3d 1358, 1366 (3d Cir. 1996).  In

making this determination, the Court must draw all reasonable inferences in favor of the non-movant.  Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994); Nat'l State Bank v. Fed. Reserve Bank of N.Y., 979 F.2d 1579, 1581 (3d Cir. 1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists.  Jersey Cent. Power & Light Co. v. Lacey Township, 772 F.2d 1103, 1109 (3d Cir. 1985).  The party opposing the motion for summary judgment cannot rest on mere allegations and instead must present actual evidence that creates a genuine issue as to a material fact for trial.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Siegel Transfer, Inc. v. Carrier Express, Inc., 54 F.3d 1125, 1130-31 (3d Cir. 1995).  "[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."  Schoch v. First Fid. Bancorporation, 912 F.2d 654, 657 (3d Cir. 1990); see also FED. R. CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a genuine issue for trial").

If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Katz v. Aetna Cas. & Sur. Co., 972 F.2d 53, 55 (3d Cir. 1992) (quoting Celotex, 477 U.S. at 322-23).  In determining whether there are any issues of material fact, the Court must resolve all doubts as to the existence of a material fact against the moving party and draw all reasonable inferences – including on issues of credibility – in favor of the non-moving party.  Watts v. Univ. of Del., 622 F.2d 47, 50 (3d Cir. 1980).

9

**B.**     *Standard for Infringement*

The test for patent infringement involves a two-step analysis. The claim must be properly construed to determine its scope and meaning and then compared to the accused device or process.  Carroll Touch, Inc. v. Electro Mech. Sys., Inc., 15 F.3d 1573, 1576 (Fed. Cir. 1993). For a court to find infringement, the plaintiff must show the presence of every limitation or its substantial equivalent in the accused device.  KX Indus. v. PUR Water Purification Prod., 18 Fed. Appx. 871, 875 (Fed. Cir. 2001) (citing Wolverine World Wide, Inc. v. Nike, Inc., 38 F.3d 1192, 1199 (Fed. Cir. 1994)).

In determining the proper construction of a claim, the court has numerous sources that it may properly utilize for guidance.  The court must examine the intrinsic evidence, which includes the claim language, the patent specification, and the prosecution history on record. Vitronics Corp. v. Conceptronic, Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996).  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language." Id.  The prosecution history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. Id.  Although extrinsic evidence may be considered, if needed, to assist in determining the meaning or scope of technical terms in the claims, where extrinsic evidence is inconsistent with the specification and file history, it should be accorded no weight. See generally, Interactive Gift Express, Inc. v. Compuserve Inc., 256 F.3d 1323, 1332 (Fed. Cir. 2001).

"A district court should approach a motion for summary judgment on the fact issue of infringement with great care."  Cole v. Kimberly-Clark Corp., 102 F.3d 524, 528 (Fed. Cir.

1996)(citation omitted).  Summary judgment of no literal infringement is proper "when no genuine issue of material fact exists, in particular, when no reasonable jury could find that every limitation recited in the properly construed claim either is or is not found in the accused device." Bai v. L & L Wings, 160 F.3d 1350, 1353 (Fed. Cir. 1998)(citation omitted).

## C.    *Standard for Evaluating Patent Validity*

### 1.    *Anticipation*

A patent is presumed valid when issued.  35 U.S.C. § 282.  A claim is invalid for anticipation if a single prior art reference published more than a year before the patent application was filed discloses each and every limitation set forth in a claim, either expressly or inherently. In re Schreiber, 128 F.3d 1473, 1477 (Fed. Cir. 1997)(citation omitted).  Inherency may not be established by probabilities or possibilities. See In re Oelrich, 666 F.2d 578, 581 (CCPA 1981).

> "The mere fact that a certain thing may result from a given set of circumstances is not sufficient. If, however, the disclosure is sufficient to show that the natural result flowing from the operation as taught would result in the performance of the questioned function, it seems to be well settled that the disclosure should be regarded as sufficient."

Id. at 581 (quoting Hansgirg v. Kemmer, 102 F.2d 212, 214 (CCPA 1939)) (internal citations omitted).

The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity.  Id.  Summary judgment is appropriate on a question of validity when the party challenging validity has shown by clear and convincing evidence facts supporting a conclusion of invalidity.  Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1423 (Fed. Cir. 1988) (citing American Hoist & Derrick Co. v. Sowa & Sons, Inc., 725 F.2d 1350, 1360, cert. denied, 469 U.S. 821 (1984)).

11

2.   *Obviousness*

Obviousness under 35 U.S.C. § 103 is a legal conclusion involving a preliminary

determination of four factual inquiries: (1) the scope and content of the prior art; (2) the

differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art;

and (4) secondary considerations, if any, of nonobviousness.  Uniroyal, Inc. v. Rudkin-Wiley

Corp., 837 F.2d 1044, 1050 (Fed. Cir. 1988)(citing Graham v. John Deere Co., 383 U.S. 1, 17-18

(1966)). Secondary considerations include objective indicia of nonobviousness such as

commercial success, long-felt but unsolved need, and failure of others.  Uniroyal, 837 F.2d at

1050; see also Graham, 383 U.S. at 17.

## DISCUSSION

EdgeCo. has moved for partial summary judgment of non-infringement of claims 1-11

and invalidity of claims 13 through 16 of the '229 patent.  FastCap filed a cross-motion for

partial summary judgment that the '229 patent is not invalid and that EdgeCo. literally infringes

claim 13 of the '229 patent.

I.        **Infringement**

A.        **EdgeCo.'s Motion for Summary Judgment of Non-Infringement
of Claims 1-11**

In resolving EdgeCo.'s claims of invalidity and noninfringement**,** this Court begins with

the issue of claim construction.

Claim construction is a matter of law to be resolved by the Court.  Markman v. Westview

Instruments, Inc., 52 F.3d 967, 976 (Fed. Cir. 1995) (en banc), aff'd, 517 U.S. 370 (1996). In

determining the proper construction of a claim, the court may utilize numerous sources for

guidance, including the claim language, the patent specification, and the prosecution history on

record, which together constitute the intrinsic evidence.  Vitronics Corp., 90 F.3d at 1582.  "Such intrinsic evidence is the most significant source of the legally operative meaning of disputed claim language."  Id.

Claims should be construed so as to sustain their validity.  ACS Hospital Systems, Inc. v. Montefiore Hospital, 732 F.2d 1572, 1582 (Fed. Cir. 1984).  Moreover, claims should be read in a way that avoids ensnaring prior art if it is possible to do so.  Harris Corp. v. IXYS Corp., 114 F.3d 1149, 1153 (Fed. Cir. 1997).

This Court must look to the words of the claims themselves, both asserted and nonasserted, to define the scope of the patented invention.  The specification acts as a dictionary "when it expressly defines terms used in the claims or when it defines terms by implication." Vitronics, 90 F.3d at 1577.  The specification contains a written description of the invention which must be clear and complete enough to enable those of ordinary skill in the art to make and use it.  35 U.S.C. § 112.

The prosecution history contains the complete record of all the proceedings before the Patent and Trademark Office, including any express representations made by the applicant regarding the scope of the claims. Southwall Tech., Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995).  The prosecution history limits the interpretation that was disclaimed during prosecution.  Included within an analysis of the file history may be an examination of the prior art cited therein.  Id.

Before construing the claims, this Court addresses EdgeCo.'s arguments that the claims of the '229 patent are ambiguous and that Mr. Greg Davis, FastCap's expert witness, is not qualified to opine as to the meaning of the terms used in the claim construction analysis.

1.      **Ambiguity**

EdgeCo. argues that the language in method claims 1-11 of the '229 patent is indefinite and ambiguous, containing three operative steps, only two of which are active.  (Pl./Countercl. Def. Mot. Opp'n to Defs.' Mot. Summ. J. at 20.)[3]  EdgeCo. argues that the three operative steps are those identified as 1(ii)(a)-(c) of claim 1 and that these operative steps and the active steps are ambiguous because the language states what can be done and not what is being done.  (Id.)

35 U.S.C. § 112 states, in relevant part:

> The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

The specification generally includes 1) a written description, 2) the enablement, and 3) the best mode of carrying out the claimed invention.  Id.

Whether a specification complies with the written description requirement of § 112 is a question of fact.  Vas-Cath, Inc. v. Mahurkar, 935 F.2d 1555, 1563 (Fed. Cir. 1991); Ralston Purina Co. v. Far-Mar-Co, Inc., 772 F.2d 1570, 1575 (Fed. Cir. 1985).  To fulfill the written description requirement, a patent specification must describe an invention and do so in sufficient detail that one skilled in the art can clearly conclude that "the inventor invented the claimed invention." Lockwood v. American Airlines, Inc., 107 F.3d 1565, 1572 (1997).  A patent complies if the written description containing all the patent's claimed limitations uses "such

---

[3] During oral arguments, held December 6, 2004 on this matter, this Court denied EdgeCo.'s request for a Markman hearing.  The necessity of a Markman hearing to resolve disputed claim language is a matter of law to be resolved by the Court. Markman, 52 F.3d at 976.  As explained during the colloquy and below, this Court finds that there are no claim construction issues that warrant a Markman hearing.

descriptive means as words, structures, figures, diagrams, formulas, etc., that set forth the claimed invention." Id. at 1572.

While the language of the '229 patent is not seamless prose, the claims are "full, clear, concise, and exact terms as to enable any person skilled in the art, . . . to make and use the invention." 35 U.S.C. § 112.  The language of claims 1-11 and 13 describe the method and product of the '229 patent.  A generally planar cover member is applied by positioning the adhesive cover over the screw hole, bending the cover member and adjusting the position of the cover member until it sufficiently covers the screw hole, and pressing the cover member over the top of the screw hole.  ('229 patent, col. 16-20.)  None of the allegedly ambiguous language would prevent one skilled in the art from determining the nature of the invention, the claim limitations of the invention, the enablement or the best mode of the invention.

Therefore, this Court finds that the language of the claims is not ambiguous and interprets the claim language as indicated below.

### 2.    FastCap's Expert Witness Greg Davis

EdgeCo. also contends that FastCap's proffered expert witness, Mr. Greg Davis, lacks the qualifications, pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., to opine as to the construction of the claims. 509 U.S. 579, 579-80 (1993).  To assist this Court in construing the terms of the claims of the '229 patent, FastCap submitted and this Court considered the expert report of Mr. Greg Davis, FastCap's International Sales Manager (the "Davis Expert Report").

According to EdgeCo., Mr. Davis has "no qualifications to render an opinion on the claim interpretation." (Pl./Countercl. Def. Mem. Opp'n FastCap's Mot. Summ. J., 14.) [4]

The admission of expert testimony is governed by Federal Rule 702, which provides in relevant part that:

> [i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Under Rule 702 of the Federal Rules of Evidence, there are three substantive restrictions on expert testimony: relevance, reliability, and helpfulness to the trier of fact's evaluation of such evidence. Elcock v. Kmart Corp., 233 F.3d 734, 741-43 (3d Cir. 2000).

Daubert's questions are to be used as a tool and framework for conducting the inquiry into the reliability of expert testimony.[5] Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 151 (1999). "Before an expert witness may offer an opinion pursuant to Rule 702 he must first be qualified by virtue of specialized expertise." Elcock, 233 F.3d at 741. Either practical experience

---

[4] EdgeCo. also challenges the admission of Mr. Davis's Second Supplemental Declaration, arguing that it was submitted out of time. (EdgeCo.'s April 20, 2004 Ltr., at 2.) During the colloquy with the Court at oral argument, EdgeCo. and FastCap acknowledged that the confusion regarding timeliness of certain submissions arose from the numerous declarations and supplemental declarations submitted in response to arguments asserted in the moving papers and opposition to EdgeCo.'s motion and FastCap's cross-motion for summary judgment. (Hr'g. Tr. 16-18; 25-27.) Having heard parties' arguments and considered parties' submissions, this Court finds that neither party may assert with clean hands that certain supplemental declarations should be excluded from the record, and therefore, this Court considers the submissions as noted in this Opinion. See infra n.7.

[5] The Daubert factors for analyzing the reliability of testimony are: (1) whether a theory or technique can be (and has been) tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) whether there is a known or potential rate of error and whether there are standards for controlling the error; and, (4) whether the theory or technique enjoys general acceptance within a relevant scientific community. See Daubert, 509 U.S. at 592-95.

or academic training and credentials may be sufficient to satisfy the standard. Id. Courts have

interpreted the specialized knowledge requirement liberally, extending the policy to the

substantive and formal qualification of experts. See, e.g., In re Paoli, 35 F.3d at 741.

FastCap introduced expert testimony from Greg Davis to explain the significance of the

hardness specification test in the '229 patent, to apply the hardness specification test to the

material used by All Metal to manufacture its screw covers, and to investigate the semblances

between the FASTCAP® and the EeeZee Cover. Mr. Davis graduated from Capllono College in

North Vancouver, British Columbia in 1972 and completed additional course work at the

University of California at Berkeley and at Western Washington University, including course

work in Plastics Technology and Tool Design from 1978 until 1985. (Davis Expert Report at ¶¶

2-3.) He held various positions at tool manufacturing companies from 1979 through the present

and took the position of Chief Operating Officer at FastCap, LLC in 1998. (Davis Expert Report

at ¶¶ 2-3.) In 2001, Mr. Davis assumed his current position as International Sales Manager at

FastCap, LLC. (Davis Expert Report at ¶ 8.) In his declaration, Mr. Davis describes the nature

and function of the ASTM D790-96cm hardness specification test and its significance as relates

to the '229 patent. (Davis Expert Report at ¶¶ 11-12.)

Mr. Davis performed the ASTM D790-96cm test on the FASTCAP® and EeeZee Covers

and found that EeeZee Covers "literally met the hardness and range of flex characteristics

common to the claims of [the FASTCAP®]." (Davis Expert Report at ¶ 17.)

EdgeCo. argues that Mr. Davis lacks the proper academic credentials or practical

experience to testify on the issues presented in his expert report, namely, the construction of the

terminology related to the hardness specification. Under Rule 702, a party may present academic

credentials, vocational experience or other practical experience to qualify a witness as an expert. See Waldorf v. Shuta, 142 F.3d 601, 626 (3d Cir. 1998).  A witness who is otherwise qualified as an expert "is not disqualified merely because of a lack of academic training." Id. at 626.

This Court finds that Mr. Davis is qualified to testify as an expert in this matter. FastCap laid a proper foundation in support of Mr. Davis's expert report, pointing to the wealth of his experience designing and fabricating tools for injection molding and implementing designs and managing plastics molding facilities and machinery.  Mr. Davis's academic credentials and his professional experience support the conclusion that he is competent to testify about the testing standards for designing a generally planar disc of veneer intended to cover a screw hole. Mr. Davis's credentials establish that he has a history of working with plastics and polyvinyl chloride ("PVC") products, the material from which EeeZee Covers and the FASTCAP® are made. (Davis Expert Report at ¶¶ 2-3, 11-15.)  Therefore, this Court admits Mr. Davis's expert report and considers his analysis using the hardness specification test as described in the claims of the '229 patent.

## 2.   Construction of the Claims

Claim terms are presumed to have the ordinary and customary meanings ascribed to them by those of ordinary skill in the art.  Sunrace Roots Enter. Co. v. SRAM Corp., 336 F.3d 1298, 1302 (Fed. Cir. 2003).  A term's ordinary meaning must be considered in the context of intrinsic evidence, including the claims, the specification, and the prosecution history.  3M Innovative Props. Co. and Minnesota Mining and Mfg. Co. v. Avery Dennison Corp., 350 F.3d 1365, 1371 (Fed. Cir. 2003) (citations omitted).  "[A] technical term used in a patent document is interpreted as having the meaning that it would be given by persons experienced in the field of the invention,

unless it is apparent from the patent and the prosecution history that the inventor used the term with a different meaning." Hoechst Celanese Corp. v. B.P. Chems. Ltd., 78 F.3d 1575, 1578 (Fed. Cir. 1996).

FastCap argues that the term "having a reference deflection less than 1.0 inch and greater than zero" has unique significance in the '229 patent.  (Davis Expert Report ¶ 15.)   "Reference deflection" relates to the hardness specification of the patented screw covers. ('229 patent, col. 10, lines 42-46) (noting that the "deflection values . . . are . . . used as . . . 'reference deflection values'; and when the term 'reference deflection value' appears in the claims it is to define the stiffness of the [generally planar cover] member.")  The values of the claims relate to "deflection and [are] recorded in inches."  ('229 patent, col. 10, line 24.)  The greater or "higher the deflection value the more flexible the material." ('229 patent, col. 10, lines 39-40.)  The hardness specification is defined in accordance with the standardized test method known as ASTM D790-96cm.  ASTM standards are widely accepted by engineers and other professionals in the field of materials testing. (Davis Expert Report at ¶ 11.)

Claims 1-11 and 13 disclose a specified reference deflection which reflects the resiliency requirements necessary for carrying out the steps of the claims, centering and correctly positioning the general cover member over the screw hole and pressing it to the contact surface. ('229 patent, col. 4, lines 15-26; col. 16, lines 61-62; col. 18, lines 60-65.)

### 3.    Comparing FASTCAP® Method Claims 1-11 and the EeeZee Cover

EdgeCo. argues that the EeeZee Covers are simply a product and teach no method.  (Hr'g Tr. 20-21).  In the alternative, EdgeCo. argues that the instructions for its product teach a markedly different method of application than that described in claims 1-11 of the '229 patent

and, therefore, there can be no infringement. (Pl./Countercl. Def.'s Mem. Supp. Mot. Summ. J. at

1, 20-21 (contending that the EdgeCo. method of applying the peel and stick screw covers is

*"completely different* from the method described in the patent")(emphasis added).)

EdgeCo. cannot use semantics to argue that its product teaches no method and simply

offers instructions.  EdgeCo.'s advertisement contains language explaining how the product is

applied and, during his deposition, EdgeCo.'s Vice-President, George Kaye, explained the

application of the EeeZee Cover. (Decl. Dennis Gleason, April 14, 2004, Ex. A, Dep. George

Kaye, 88:19-21 (explaining that one would "pick [the generally planar cover member] up, place

it on [the screw to be covered] and push it in place") and Ex. H.)  According to an EdgeCo.

advertisement, its method consists of three simple steps: (a) clean the surface where the screw

cover is to be applied; (b) remove the peel and stick screw cover from the backing sheet and

place it over the hole to be covered; and (c) apply pressure to the screw covers. (Decl. Dennis

Gleason, Ex. H.)

This Court finds that EdgeCo.'s instructions do not teach away from the '229 patent

method; on the contrary, the instructions disclose every limitation of the methods claims of the

'229 patent.  In both the '229 method and the EeeZee Cover instructions, the generally planar

cover member is grasped, positioned over the screw so as to cover the screw, and pressed down

onto the surface of the furniture surrounding the screw head.

Under a Rule 56 analysis, summary judgment is proper if the moving party shows that

"there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." FED. R. CIV. P. 56(c); <u>Celotex</u>, 477 U.S. at 322.  Under controlling

precedent, the burden is initially upon the movant to establish the absence of any genuine issue of

20

material fact and entitlement to judgment as a matter of law.  Id. at 323-24. Once "a properly

supported motion for summary judgment is made, the adverse party 'must set forth specific facts

showing that there is a genuine issue for trial.'" Anderson, 477 U.S. at 250 (citations and

footnotes omitted).

EdgeCo. has the burden of establishing its entitlement to judgment as a matter of law.

EdgeCo. has failed to establish that no genuine issue of material fact remains as to infringement;

and therefore, this Court denies EdgeCo.'s motion for summary judgment of non-infringement as

to claims 1-11 of the '229 patent.

### B.      FastCap's Cross-Motion for Infringement of Claim 13

FastCap cross-moves for summary judgment of infringement, arguing that EdgeCo.'s

EeeZee Cover literally infringes claim 13 of the '229 patent.  FastCap argues that Mr. George

Kaye, Vice President of EdgeCo., admitted during his deposition that the EeeZee Cover and

FASTCAP® are indistinguishable.  According to FastCap, Mr. Kaye admitted that the EeeZee

Cover falls within the reference deflection range of the hardness specification in the '229 patent.

Claim 13 of the '229 patent teaches that the generally planar cover member should be

positioned and bonded at its perimeter contact portion to the furniture surface "surrounding the . .

. opening" created by the screw head. (229 patent, col. 18, lines 41-65.)  When the perimeter edge

of the cover is moved into engagement with the surface of the wood structure, "a second portion

of the cover member may be grasped" and manipulated to "press the first portion of the cover

member into engagement with the surface structure." (Id.)  Figures 14-16 of the '229 patent

illustrate the method.

As discussed above, the operative steps involved in applying the EeeZee cover include: (a) cleaning the surface where the screw cover is to be applied; (b) removing the peel and stick screw cover from the backing sheet and place it over the hole to be covered; and (c) applying pressure to the screw cover. (Decl. Dennis Gleason, April 14, 2004, Ex. H.)

A comparison of the EeeZee Cover and the FASTCAP reveals that the EeeZee Cover discloses each and every limitation of claim 13 of the '229 patent.  Both the EeeZee Cover and claim 13 of the '229 patent teach a generally planar cover member used to cover an exposed fastener, or screw, in a furniture structure.  Both the FASTCAP and the EeeZee Cover have a diameter that is greater than the screw head.  Both products have an adhesive side that is applied to the surface area around the screw head to secure bonding between the generally planar cover member and the structure.  Unlike prior art cited in the specification of the '229 patent, neither product attempts to fill the gap between the screw head and the surface of the furniture, rather, each leaves open the spacial gap between the screw cover and the indentations in the screw that facilitate turning the screw.

In addition, the hardness specification in the '229 patent advises that the cover member should have a reference deflection less than 1.0 inch and greater than zero. ('229 patent, col. 16, lines 61-63.)  As indicated by Mr. Davis's expert report, the '229 patent's generally planar member and the EdgeCo. product have reference deflections that are less than 1.0 inch and greater than zero. (Davis Expert Report at ¶ 17.)  Mr. Davis performed the ASTM D790-96cm test on the FASTCAP® and EeeZee Covers and found that EeeZee Covers "literally met the hardness and range of flex characteristics common to the claims of [the FASTCAP®]."  (Davis Expert Report at ¶ 17.)

22

No genuine issues of material fact remain.  Weighing all inferences in favor of EdgeCo., the non-movant, this Court finds that the EeeZee Cover discloses each and every limitation of claim 13 of the '229 patent, and therefore infringes claim 13.

EdgeCo. argues that granting summary judgment of infringement of claim 13 would be inappropriate in light of its unresolved affirmative defenses.  This Court, however, resolved a number of EdgeCo.'s affirmative defenses prior to considering the instant motion and in the body of this opinion.[6]  On the record before this Court and the reasoning of this Court's instant opinion resolving parties' cross-motions for summary judgement, none of EdgeCo.'s affirmative defenses preclude entry of summary judgment.

EdgeCo.'s first affirmative defense alleges that FastCap fails to state a claim upon which relief can be granted.  On a dispositive motion challenging a counterclaim for failure to state a claim, this Court is required to accept as true all allegations in the counterclaim and all reasonable inferences that can be drawn therefrom, and to view them in the light most favorable to the non-moving party.  See In re Warfarin Sodium, 214 F.3d 395, 397-98 (3d Cir. 2000)(citation omitted).  This Court would dismiss such a counterclaim only if the alleged facts, taken as true, fail to state a claim upon which relief may be granted.  See id.  The question is whether the claimant can prove any set of facts consistent with his or her allegations that will entitle him or her to relief, not whether that person will ultimately prevail.  Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Semerenko v. Cendant Corp., 223 F.3d 165, 173 (3d Cir. 2000).

---

[6]  EdgeCo. agreed to abandon its seventh affirmative defense alleging inequitable conduct defense.  (EdgeCo.'s Ltr. March 22, 2004.)  EdgeCo.'s sixth, eighth, ninth, tenth, eleventh, twelfth, thirteenth and fourteenth affirmative defenses, are resolved in the body of this Court's opinion.  On December 16, 2004, this Court entered an Order reflecting the dismissal of FastCap, LLC and rendering moot EdgeCo.'s fifteenth affirmative defense. All remaining affirmative defenses are discussed below, see infra.

On the record as a whole, this Court finds Counterclaimant FastCap has not only plead a cognizable claim, but also presented factual evidence supporting a colorable claim upon which a reasonable trier of fact may grant relief.  Therefore, EdgeCo.'s first affirmative defense is dismissed.

EdgeCo.'s second and fourth affirmative defenses, that FastCap's claims are barred by estoppel and the laches defense, respectively, are unsupported based on the record before this Court.  The affirmative defense of equitable estoppel requires an accused infringer to prove by preponderance of evidence: 1) that the patent owner misled her into reasonably believing that the patent owner had foregone enforcement of its patent against her; 2) that she relied on this belief; and 3) that material prejudice would result from survival of the claim.  See A.C. Aukerman Co. V. R. L. Chides Const. Co., 960 F.2d 1020, 1028 (Fed. Cir. 1992) (en banc).  Similarly, an accused infringer that invokes the laches defense must prove by a preponderance of evidence the patent owner's unreasonable delay in bringing suit would result in material prejudice to the defendant.  Advanced Cardivascular Systems, Inc. v. Scimed Life Systems, Inc., 988 F.2d 1157, 1161 (Fed. Cir. 1983) (stating that the period of delay is measured from the time that plaintiff had actual notice of the claim or would reasonably have made an inquiry about the issue)(citation omitted).

According to EdgeCo.'s own representation of the facts, EdgeCo. expanded its product line to include pre-cut circular disk-shaped tabs that were of the peel and stick variety beginning in October 2001.  (Pl./Counterclaim Def. EdgeCo.'s Statement of Uncontested Material Facts in Supp. of its Mot. Summ. J., at ¶¶ 3-4.)  It is undisputed that FastCap wrote EdgeCo. regarding the EeeZee Cover's possible infringement of the '229 patent on October 29, 2001 - the very same

month EdgeCo. began marketing and selling the product. (Id. at ¶ 16.)  EdgeCo. cannot direct the

Court to any evidence in the record supporting either a defense of laches or estoppel, and

therefore, this Court dismisses EdgeCo.'s second and fourth affirmative defenses.

Moreover, EdgeCo. has failed to present even a scintilla of evidence supporting its third

and fifth affirmative defenses, alleging FastCap's claims are barred by the doctrine of waiver and

the doctrine of unclean hands, respectively.  EdgeCo.'s pleading contains only a conclusory

statement that fails to provide basic notice under Rule 8(a). (Answer to Counterclaim, 2-4.)

EdgeCo. may not rest on a mere listing of defenses, without presenting factual support for at least

the basis of these defenses, in its efforts to preclude summary judgment.  (Id.) No genuine issue

as to a material fact remains for trial regarding these defenses.  See Anderson, 477 U.S. at 248.

"[U]nsupported allegations . . . and pleadings are insufficient to repel summary judgment."

Schoch v. First Fidelity Bancorporation, 912 F.2d 654, 657 (Fed. Cir. 1990); see also FED. R.

CIV. P. 56(e) (requiring nonmoving party to "set forth specific facts showing that there is a

genuine issue for trial").

Therefore, this Court grants FastCap's motion for summary judgment of infringement of

claim 13 of the '229 patent.

II.     **Validity**

EdgeCo. has moved for summary judgment of invalidity of claims 13 through 16 of the

'229 patent, pursuant to 35 U.S.C. sections 102(a), (b), and (f).  EdgeCo. argues that the

FASTCAP® is anticipated by prior art, All Metal Screw covers.  EdgeCo. further argues that the

FASTCAP® is invalid because it is obvious, pursuant to 35 U.S.C. § 103.  FastCap filed a cross-

motion for summary judgment of validity of claims 13-16 of the '229 patent.

A.     **Anticipation**

Pursuant to the statute, this Court presumes the '229 patent to be valid. 35 U.S.C. § 282

(2002). The burden of establishing invalidity of a patent or any claim rests on the party asserting

such invalidity; in this instance,  EdgeCo. asserts the patent is invalid and, therefore bears the

burden of demonstrating invalidity.  The presumption of patent validity may be rebutted only by

clear and convincing evidence.  Uniroyal, Inc., 837 F.2d at 1050 (citation omitted).  The statute

states, in relevant part, that a person shall be entitled to a patent unless,

> (a) the invention was known or used by others in this country, or patented
>   or described in a printed publication in this or a foreign country, before
>   the invention thereof by the applicant for patent, or
> (b) the invention was patented or described in a printed publication in this
>   or a foreign country or in public use or on sale in this country, more than
>   one year prior to the date of the application for patent in the United
>   States, or . . . .
> (f) he did not himself invent the subject matter sought to be patented[.]

35 U.S.C. § 102.

To avail on its motion for summary judgment that claims 13-16 are invalid for

anticipation, EdgeCo. must present clear and convincing evidence that a single prior art reference

discloses, either expressly or inherently, each limitation of the claims.  In re Cruciferous Sprout

Litig., 301 F.3d 1343, 1348 (Fed. Cir. 2002) (citation omitted) cert. denied 123 S. Ct. 1487 (U.S.

2003); see also Carella v. Starlight Archery and Pro Line Co., 804 F.2d 135, 138 (Fed. Cir.

1986).  Inherent anticipation follows when missing descriptive information is necessarily present.

See In re Oelrich, 666 F.2d 578, 581 (CCPA 1981).  Inherency may not be established by

probabilities or possibilities.  Id.

       To find that prior art anticipates, this Court must conclude that, as viewed by a person of

ordinary skill in the field, there is no difference between the claimed invention and the reference

disclosure.  Scripps Clinic & Research Found. v. Genentech, Inc., 927 F.2d 1565, 1576 (Fed. Cir.

1991) (citations omitted).  Summary judgment is appropriate on a question of validity when the

party challenging validity has shown by clear and convincing evidence facts supporting a

conclusion of invalidity.  Ryco, Inc. v. Ag-Bag Corp., 857 F.2d 1418, 1423 (Fed. Cir. 1988).

       A person shall be entitled to a patent unless he himself did not invent the subject matter

sought to be patented. 35 U.S.C. § 102(f).  "Where an applicant by oath or declaration states that

he is the sole inventor of a particular invention, strong evidence is required to reach a contrary

conclusion."  Ex Parte Kusko, 215 U.S.P.Q. 972, 974 (Pat. &  Tr. Office Bd. App. 1981).  In

most cases involving a determination under Section 102(f), the issue is "whether one party

derived an invention from another, and the relative dates of the events in evidence are important

and are considered in deciding such issues." Id.

       Paul Akers is the named inventor of the FASTCAP® and in his declaration submitted in

this matter and his deposition taken under oath, Mr. Akers affirms that he developed the patented

product and method of the '229 patent.  (Decl. Paul Akers at ¶ 1.)  The '229 patent issued on

December 7, 1999.  (Decl. Michael Cronen, Feb. 26, 2004, Ex. A, '229 patent.)

As the prosecution history of the '229 patent indicates, there are numerous patents issued for screw covers. The patented screw covers vary greatly in size, material, and application. ('229 patent, col. 2, lines 10-48, 21-26 discussing U.S. Pat. No. 5,419,666 (Best) (a protective cover to provide a waterproof cover over a fastener); U.S. Pat. No. 4,601,624 (Hill) (a screw head cover that is held in place by a retaining element that is itself held by the screw); U.S. Patent No. 264,776 (Sharp) (which shows a hollow plug which fit into the upper portion of a countersunk slot that is above the head of the screw); and U.S. Patent No. 4,630,168 (Hunt) (a "fastener having a dielectric cap to fill a gap between the fastener head and the counterboard surface on which the fastener is installed").

In order to anticipate, prior art must disclose each and every limitation of the claimed device. This Court considers the limitations of the '229 patent and finds that All Metal screw covers do not disclose each and every limitation of the '229 patent. The All Metal screw covers and the FASTCAP® are different sizes, function in different manners, and are made of materials that differ as to their resiliency.

According to Mr. Jack Lasee, President of All Metal, the All Metal's screw cover functions like a dowel, allowing the screw cover to "fit[ ] snugly into the hole left by the punch." (Decl. Jack Lasee at ¶ 6.)[7] In using the term "dowel" to describe the All Metal screw covers, Mr.

---

[7] Defendants/Counterclaim Plaintiffs FastCap challenge the admissibility of certain assertions in the declarations of Mr. Jack Lasee on the grounds that Mr. Lasee fails to allege that the documents were created prior to the critical date for establishing that All Metal is prior art pre-dating the subject matter of the patent-at-issue, that he failed to authenticate certain documents, and that he misled the Court regarding the creation dates of certain exhibits. (Defs./Countercls.' Mot. Summ. J. at 7). Plaintiff/Counterclaim Defendant EdgeCo. submitted additional affidavits aiming to cure many of these defects. (Supplemental Decl. Jack Lasee, Decl. Donald Lasee, Decl. Dell Peissig, and Decl. Thomas Waggoner.)

Lasee's characterization distinguished the function of the All Metal screw covers from that of the FASTCAP®. By definition, a screw cover that can be described as a "plug" or a "dowel"[8] functions differently than the screw cover described in the '229 patent. Nothing in the '229 patent suggests that the product is designed to plug or fill the screw hole. In addition, the All Metal product adheres to the surface of the screwhead and not to the surrounding wood finish. (Id.) (noting that "[b]ecause the veneer [screw cover] has an adhesive glue on its surface that contacts the screw head, it remains in place once it is affixed to the head of the screw.")) The FASTCAP® is attached to the wood surface surrounding the screw head. ('229 patent, col. 16, lines 31-39.)

Comparison of the size of the screw covers further suggests that All Metal screw covers teach away from the FASTCAP®. The limitations set forth in the '229 patent demonstrate that the FASTCAP® screw cover is a "flat[,] circular" disc that has "predetermined maximum edge to edge lateral dimensions" and a specified thickness and resiliency. ('229 patent, col. 3, lines 1-7.) The FASTCAP® is oversized, being a diameter "moderately larger than the diameter of the countersink opening" created by the screw hole. ('229 patent, col. 7, lines 55-63.) In his supplemental declaration, Jack Lasee describes the diameter of All Metal screw covers as "slightly less than the diameter of the screw head due to the cutting." (Decl. Jack Lasee at ¶ 12); (Decl. Dell Peissig at ¶ 5 (noting that "the resulting disc was slightly less than the diameter of the screw head.").) Moreover, the prosecution history in the '229 patent supports the conclusion that prior art involving "a cap over the exposed screw head" that had to be pushed into the

---

[8] A dowel is "a pin fitting into a hole in an abutting piece to prevent motion or slipping" or "a piece of wood driven into a wall so that other pieces can be nailed to it." Merriam Webster's Collegiate Dictionary 348-49 (10th ed. 1996).

countersunk screw to "retain[] engagement with the screw head" . . . . [having] the configuration of the Philips head recess in the exposed surface of the screw" does not anticipate the '229 patent. ('229 patent, col. 1, lines 42-45 (listing prior art).)

In addition, a comparison of the materials used in the manufacture of the products suggests All Metal screw covers teach away from the FASTCAP®.  All Metal used veneer from Formwood Industries and Jacaranda, Inc. "having a thickness of '10 MIL.'"[9]  (Supplemental Decl. Jack Lasee at ¶¶ 22, 24, Ex. 2.)  According to Mr. Greg Davis, FastCap's expert witness, a 10 MIL veneer "would not work in the manner of the patent claims, specifically including claim 13, because it is many times more flexible than the reference deflection parameters of the patent claims." (Supplemental Decl. Greg Davis at ¶ 3.)  The patent specification provides "the cover member desirably has a reference deflection value less than 1.0 inch, more desirably less than 0.9 inch, no more than about 0.8 inch, or 0.7 inch.  Desirably, the reference deflection value is no greater than about 0.6 inch." ('229 patent, col. 4, lines 15-17.)

 EdgeCo. argues that Mr. Jack Lasee's testimony -- that the veneer used by All Metal would allow an installer "to see beneath the bent disc to insure its proper positioning over the screw head" -- further establishes that All Metal screw covers satisfy the reference deflection limitation set forth in the '229 patent.  (Supp. Decl. Jack Lasee at ¶ 23.)  EdgeCo.'s argument fails for several reasons.  Mr. Lasee's statement does not describe, with any degree of scientific specificity, the measure of resilience of the material used to manufacture the All Metal screw

---

[9] During oral arguments on the instant motions, EdgeCo. argued that the 10 mil reference to the thickness of the veneer purchased by All Metal has been incorrectly presumed to exclude the "other material layers." (Hr'g Tr., December 6, 2004, 11:24-25; 12:1.)  EdgeCo.'s contention does not, however, present affirmative evidence on the thickness of the veneer purchased by All Metal or that the veneer has a reference deflection within the testing range of the '229 patent.

covers.  Mr. Lasee's testimony is conclusory and uncorroborated by any scientific testing

evidence.  Mr. Lasee's testimony alone does not present grounds for a well-founded conclusion

that the All Metal screw cover satisfies the reference deflection limitation in the '229 patent.

 This Court finds that All Metal teaches away from the FASTCAP®, and therefore, fails

to disclose each of the limitations of the '229 patent.  The All Metal screw covers and the

FASTCAP® differ in size, reference deflection, and function (the FASTCAP® overlays the

screw hole while the All Metal product plugs the screw hole).  This Court, therefore, denies

EdgeCo.'s motion for summary judgment that claims 13-16 of the '229 patent are invalid as

anticipated by prior art All Metal screw covers.

### B. *Obviousness*

 EdgeCo. also argues that one skilled in the art would find that the '229 patent is "nothing

more than . . . an obvious iteration of the existing peel and stick screw covers." (Pl./Countercl.

Def. Mem. Supp. Mot. Partial Summ. J. at 18.)  EdgeCo. argues "the mere act of putting it on the

screwhead rather than on the periphery of the hole [is] an obvious expedient . . . . Any reasonable

person, can see it's obvious." (Hr'g Tr., Dec. 6, 2004, 9:3-8.)

 A patent is found to be invalid for obviousness, pursuant to 35 U.S.C. § 103, if the

differences between the subject matter sought to be patented and the prior art are such that the

subject matter as a whole would have been obvious at the time the invention was made to a

person having ordinary skill in the art.  Graham v. John Deere Co., 383 U.S. 1, 17 (1966).

Obviousness is a question of law based on underlying questions of fact.  Advanced Display Sys.,

Inc. v. Kent State Univ., 212 F.3d 1272, 1284-85 (Fed. Cir. 2000)(citation omitted).  To

determine whether a patent is invalid for obviousness, a court considers four factual inquiries: (1)

the scope and content of the prior art; (2) the differences between the claims and the prior art; (3) the level of ordinary skill in the pertinent art; and (4) secondary considerations, if any, of nonobviousness.  Id.  Secondary considerations include objective indicia of nonobviousness such as commercial success, long-felt but unsolved need, and failure of others. Id; see also Uniroyal, Inc., 837 F.2d at 1050.

To conclude that a challenged patent is obvious based on a single particular prior art reference, there must be a showing of a suggestion or motivation to modify the teachings of that reference.  B.F. Goodrich Co. v. Aircraft Braking Systems Corp., 72 F.3d 1577, 1582-83 (Fed. Cir. 1996) (citations omitted).  While the suggestion or motivation need not be expressly stated, it "'may be shown by reference to the prior art itself, to the nature of the problem solved by the claimed invention, or to the knowledge of one of ordinary skill in the art.'" Medical Instrumentation and Diagnostics Corp. v. Elekta AB, 344 F.3d 1205, 1221-22 (Fed. Cir. 2003) (quoting Beckson Marine, Inc. v. NFM, Inc., 292 F.3d 718, 728 (Fed. Cir. 2002)).  The Supreme Court has warned against the danger of hindsight bias. See, e.g., Graham, 383 U.S. at 36 (consideration of secondary factors "serve[s] to guard against slipping into use of hindsight and to resist the temptation to read into the prior art the teachings of the invention in issue" (internal quotations and citations omitted)); In re Kotzab, 217 F.3d 1365, 1369 (Fed. Cir. 2000) ("[T]he very ease with which the invention can be understood may prompt one to fall victim to the insidious effect of a hindsight syndrome wherein that which only the invention taught is used against its teacher." (citation omitted)).

Claims 13 through 16 are directed to a veneer screw cover applied by peeling the screw cover, attached to a sheet of screw covers by an adhesive on one side, positioning the screw cover over an exposed screw head in a wood surface and adhering the screw cover to the wood surface. The written description of the '229 patent recites numerous patents issued for screw covers made to accommodate various fastened materials and employing a variety of methods. ('229 patent, col. 2, lines 10-48.)

The Background Art section of the patent explains that "[f]or many decades the commonplace method of covering the exposed screw head [was] to place a cap over the exposed screw head, and push the cap into retaining engagement with the screw head." ('229 patent, col. 1, lines 42-45.) The written description of the '229 patent reveals that many patent prior art references described an invention that covered a screw head. (Id., col. 1, lines 42-45) (citing U.S. Pat. No. 5,419,666 (Best) (describing a waterproof cover placed atop a fastener); U.S. Pat. No. 4,601,624 (Hill) (describing a screw head cover that is held in place by a retaining element that is itself held by the screw); and U.S. Patent No. 264,776 (Sharp) (issued in 1882 describing "a hollow plug which fit into the upper portion of a countersink slot that is above the head of the screw").)

The '229 patent uses different sized covers made from material having a different reference deflection, an integral aspect of the '229 patent that facilitates its easy application. FastCap argues that the method taught by All Metal is precisely the "tedious and time consuming" method that the '229 patent aims to eliminate. (Defs./Countercl. Pls.' Mot. Summ. J. at 16.) All Metal uses "a metal punch to die cut the veneer around the screw holes in the window frames." (Decl. Jack Lasee at ¶ 6.) After the screws are countersunk, they are covered "by

33

plugging the holes with the same veneer material that was die cut." (Id.)  The All Metal screw

cover "fits snugly into the hole left by the punch." (Id.)

FastCap teaches a screw cover that is "positioned so that with a first edge portion of the

cover member" is attached to the "perimeter edge of the surface opening" and "grasped in a

manner to manipulate the cover member," centering the cover member and finally applying

sufficient force to engage the cover member "surrounding the surface opening." ('229 patent, col.

16, lines 12-62.)  The distinguishing factors must be evaluated in their entirety and the '229

patent, when considered as a whole, teaches away from the alleged prior art activities of All

Metal.

In Graham, the Federal Circuit outlined the secondary considerations indicating that the

subject matter of the patent-in-suit is not obvious. 383 U.S. at 17.  Commercial success, long-felt

but unsolved needs, and failure of others are among the characteristics considered.  Id.

Applying these secondary considerations to the patent-at-issue, this Court notes that the

FASTCAP® has attained notable commercial success.  Approximately nine and a half billion

units of the patented product have been sold.  (Defs./Countercls.' Mot. Summ. J. at 18.)  These

sales have generated between two and a half and three million dollars in sales revenue. (Id.)

According to FastCap, their total revenue for the period beginning August 1997 through the

present exceeds nine and one-half million dollars. (Decl. Paul Akers at ¶ 9.)  In addition, the

patent history of screw covers presented in the '229 patent indicates the long-felt but unresolved

need for an easy, peel and stick screw cover that could be used by professional woodworkers and

amateurs alike.

34

Having only asserted a single prior art reference, EdgeCo. cannot argue rejection for obviousness based on a combination of references.  A single prior art reference may establish obviousness if the reference discloses each of the elements of the challenged claim, separately or in sub-combination. <u>Gorman</u>, 933 F.2d 986.  "The criterion, however, is not the number of references, but what they would have meant to a person of ordinary skill in the field of the invention." <u>Id.</u>  The test is whether the teachings of the prior art, taken as a whole, would have made obvious the claimed invention.  <u>Id.</u>

When a party asserting invalidity identifies multiple references whose teachings implicate the claimed invention, we ascertain whether there is any suggestion or motivation in the prior art to combine the teachings and if the claimed invention reflects a combination of the teachings. <u>Karsten Mfg. Corp. v. Cleveland Golf Co.</u>, 242 F.3d 1376, 1385 (Fed. Cir. 2001) ("In holding an invention obvious in view of a combination of references, there must be some suggestion, motivation, or teaching in the prior art that would have led a person of ordinary skill in the art to select the references and combine them in the way that would produce the claimed invention."); <u>see</u> <u>also</u> <u>Interconnect Planning Corp. v. Feil</u>, 774 F.2d 1132, 1143 (Fed. Cir. 1985); <u>and</u> <u>Gorman</u>, 933 F.2d at 986 ("'Obviousness cannot be established by combining the teachings of the prior art to produce the claimed invention, absent some teaching, suggestion or incentive supporting the combination.'") (citations omitted ).  While ultimately a determination of obviousness is a legal conclusion, "[t]he presence or absence of a motivation to combine references in an obviousness determination is a pure question of fact." <u>In re Gartside</u>, 203 F.3d 1305, 1316 (Fed. Cir. 2000) (citation omitted).

This Court finds that the FASTCAP® does not teach all of the limitations of the single

prior art reference.   While obviousness may also be established where a patent holder combines

the teachings of the prior art to produce the claimed invention, EdgeCo. does not clearly

articulate a combination of references that render the subject matter of the '229 patent obvious.

A court may not conclude that a combination of references renders a patent obvious absent some

teaching, suggestion or incentive supporting the conclusion that the patent limitations are

combination of the teachings. Carella, 804 F.2d at 140 (citation omitted).

Upon considering parties' submissions and having heard oral argument, this Court finds

that the All Metal screw covers do not constitute prior art, and therefore, do not anticipate claims

13-16 of the '229 patent.  In addition, this Court finds that claims 13-16 are not obvious. This

Court finds that claims 13-16 are valid and therefore, this Court denies EdgeCo.'s motion for

partial summary judgment that claims 13-16 are invalid and obvious and grants FastCap's cross-

motion for partial summary judgment that claims 13-16 are valid.

## III.   Admissibility of Arthur Jacob's Affidavit

FastCap has moved to strike the declaration of Arthur Jacob, arguing that the declaration

is  "nothing more than inadmissible hearsay and attorney opinion argument." (Defs./Countercl.

Pls.' Br. Supp. Cross-Mot. Strike at 2.)  FastCap challenges Mr. Jacob's scientific and legal

conclusions about the similarities among the FASTCAP®, the EeeZee Cover, and All Metal's

screw covers.  The issue raised here presents a procedural question and not an issue unique to

patent law.

Mr. Jacob has a bachelor of science degree in mechanical engineering from

Massachusetts Institute of Technology and a juris doctor from The George Washington

University Law School.  (Decl. Arthur Jacob at ¶ 2.)  He is admitted to practice in New Jersey.

(Id. at ¶ 1.)  Mr. Jacob's declaration recounts the background facts regarding correspondence

between FastCap and EdgeCo. prior to the commencement of this litigation.  (Id.)  Mr. Jacob sent

a letter to FastCap on EdgeCo.'s behalf on two separate occasions.  (Id.)  In his correspondence

of November and December of 2001, Mr. Jacob indicated that he had "conducted an

investigation of the allegations of patent infringement" and that the "results of [his] investigation

confirmed that the EdgeCo. peel and stick screw covers were identical in all significant aspects to

peel and stick screw covers that had been on sale since 1992." (Id. at ¶ 9.)  Mr. Jacob enclosed

samples of the All Metal peel and stick screw covers in the December 2001 letter to FastCap. (Id.

at ¶ 10.)

    In addition, Mr. Jacob claims to have conducted an evaluation of the All Metal screw

covers, the FASTCAP®, and EeeZee Covers and, based on his investigations, he drew certain

legal conclusions regarding the validity of the '229 patent.  Mr. Jacob contends that he

"compared the [samples of the All Metal and EdgeCo. peel and stick screw covers] by putting

them in [his] hand, examining them and using [his] fingers to feel them and test their bending

characteristics."  (Supplemental Decl. Arthur Jacob at ¶ 9.)  According to Mr. Jacob, "EdgeCo.

and All Metal screw covers . . . have no discernable difference in stiffness and bending

characteristics, in terms of resistance to bending and resiliency."  (Id. at ¶ 10.)  Therefore, Mr.

Jacob concluded that "the EdgeCo. peel and stick screw covers have virtually the same

characteristics as the peel and stick screw covers made by All Metal Stamping."  (Decl. Arthur

Jacob at ¶ 11.)

    In his supplemental declaration, Mr. Jacob claims that he tested the All Metal screw

covers in accordance with the specification of the '229 patent while in an office and concluded

that All Metal screw covers "fit easily within the parameters of deflection referred to in the '229

patent." (Supplemental Decl. Arthur Jacob at ¶ 18.)  EdgeCo. argues that Mr. Jacob's testimony

is lay witness testimony and further argues that Mr. Jacob is "eminently" qualified to render an

opinion as a lay witness in this matter.

This Court finds that EdgeCo. attempts to circumvent the requirements established

pursuant to Federal Rule of Civil Procedure 26 and Federal Rules of Evidence 702, 703, and 705

by presenting Mr. Jacob's unsupported testimony, specifically the scientific and legal conclusions

regarding the validity of the '229 patent and the application of the hardness specification test.

Federal Rule of Evidence 701 provides,

If the witness is not testifying as an expert, the witness's testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness's testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Lay witness testimony is permissible, pursuant to the Rule, where it is rationally based on the

perceptions of the witness and helpful to the trier of fact.  Asplundh Mfg. Div. v. Benton Harbor

Enr'g, 57 F.3d 1190, 1193 (3d Cir. 1990).  Lay witnesses may also testify about scientific or

technical matters where the trial judge has determined the lay witness is qualified to render such

an opinion. Id. at 1193.

This Court finds that Mr. Jacob is permitted, as a lay witness, to testify regarding his

retention by EdgeCo. and the correspondence exchanged in the development of the litigation.

Mr. Jacob, as the author of the letters sent in November and December of 2001, has personal

knowledge of the correspondence between EdgeCo. and FastCap.  This Court denies FastCap's

motion to strike Mr. Jacob's testimony regarding this general factual information.

Mr. Jacob's performance of the reference deflection test, however, and his conclusions determining whether All Metal screw covers fall within the parameters of deflection referred to in the '229 patent require closer scrutiny.

> Rule 701's requirement that the opinion be 'rationally based on the perception of the witness demands more than that the witness have perceived something firsthand; rather, it requires that the witness's perception provide a truly rational basis for his or her opinion. Similarly, the second requirement--that the opinion be 'helpful to a clear understanding of the witness's testimony or the determination of a fact in issue'--demands more than that the opinion have a bearing on the issues in the case; in order to be 'helpful,' an opinion must be reasonably reliable. In other words, Rule 701 requires that a lay opinion witness have a reasonable basis grounded either in experience or specialized knowledge for arriving at the opinion that he or she expresses.

Asplundh Mfg. Div., 57 F.3d at 1201 (citation omitted). When considering lay witness testimony requiring specialized expertise or training, the trial judge, functioning as a gatekeeper, determines the witness's qualifications to opine on the issue. Id. When a lay witness seeks to opine on technical matters, "the trial judge should rigorously examine the reliability of the lay opinion by ensuring that the witness possesses sufficient special knowledge or experience which is germane to the lay opinion offered." Id.

EdgeCo. argues that Mr. Jacob is offered as a qualified lay witness to testify regarding whether All Metal anticipates the '229 patent and to compare, for the purpose of resolving the defenses of anticipation, validity, and non-infringement, the All Metal product, EeeZee Covers and the FASTCAP®.  (Pl./Countercl. Def. Mem. Supp. Mot. Partial Summ. J. and Opp'n to Cross-Mot. at 10.)

EdgeCo.'s arguments do not avail for several reasons.  First, based on the record before this Court, it is unclear that Mr. Jacob's general educational and professional background

establish that he is qualified to present the testimony offered.  Mr. Jacob, as a lay witness, need

not profess the qualifications of an expert witness to give testimony as to a scientific or technical

matter.  For this Court to admit Mr. Jacob's testimony, however, EdgeCo. must introduce

evidence that Mr. Jacob, as a lay witness, has specialized knowledge about the subject area of his

testimony and that his testimony is reliable.  Asplundh Mfg. Div., 57 F.3d at 1193.

　　　　While Mr. Jacob's credentials are laudable - he is a graduate of the prestigious

Massachusetts Institute of Technology and has a law degree from The George Washington

University Law School, as well as a notable former career as an examiner in the Patent and

Trademark Office - EdgeCo. does not identify any qualifications relevant to discuss the specific

matters in this litigation.  In his declaration, Mr. Jacob notes that he is familiar with many

"mechanical inventions" and that he has "prepared approximately 1,000 patent applications."

(Id. at 10.)  EdgeCo., however, asks this Court to admit Mr. Jacob's testimony as a lay witness

with specialized knowledge comparing the products at issue and applying the ASTM D790-96cm

test employed in the '229 patent.  EdgeCo. has not offered any specific information regarding

how or why Mr. Jacob qualifies to testify regarding these matters.

　　　　Secondly, even if Mr. Jacob were qualified to testify as to patent validity and

infringement, there is insufficient support for the conclusions he reaches, and therefore, the

conclusions are unreliable.  In support of his legal conclusion that EdgeCo. and All Metal

products have similar characteristics, Mr. Jacob states "both peel and stick screw covers have a

veneer member with an exposed upper surface and an adhesive contact surface and both are

relatively stiff."  (Decl. Arthur Jacob at ¶ 11.)   Mr. Jacob states that he tested the flexibility of

the All Metal product, applying the ASTM D790-96cm reference deflection test in EdgeCo.'s

attorneys' office.  (Id.)  Mr. Jacob's explanations do not offer any additional information

describing the test method applied or any recording of the results; he merely concludes, "the All

Metal screw covers fit easily within the parameters of deflection referred to in the '229 patent."

(Supplemental Decl. Arthur Jacob at ¶ 18.)  Mr. Jacob's conclusions that the All Metal and

FastCap products are identical suffer from the same deficiency - - an absence of sufficient

information explaining how Mr. Jacob reached these conclusions.

Third, EdgeCo. failed to give proper notice regarding Mr. Jacob's testimony on the

breadth of topics he discusses in his declarations.  EdgeCo. argues that FastCap received timely

notice regarding Mr. Jacob's testimony during George Kaye's deposition and in its response to

Defendants' interrogatory requesting that EdgeCo. "identify each person whom [sic]

communicated any opinion to [EdgeCo.] regarding the validity of Fastcap's '229 patent or [its]

infringement thereof."  (Pl./Countercl. Def.'s Mem. Supp. Mot. Partial Summ. J. and Opp'n to

Cross-Mot. Strike at 10.)  Neither of the references cited by EdgeCo. provide notice that Mr.

Jacob would discuss or perform the reference deflection test or make scientific and legal

conclusions that would project qualified, technical knowledge of the products at issue.  Mr.

Jacob's correspondence contains a terse statement about the merits of the litigation and did not

indicate that Mr. Jacob would testify as an "eminently" qualified witness rendering opinions

regarding plastics and wood design and the application of the ASTM D790-96cm test.

While EdgeCo. has not formally moved to have Mr. Jacob designated as an expert

witness and EdgeCo. represented to the Court at oral argument that Mr. Jacob has not been

offered as an expert, the arguments in EdgeCo.'s moving papers contend that Mr. Jacob's

testimony is admissible on the grounds that he is "eminently qualified."  EdgeCo. presumes that

by labeling Mr. Jacob's as a lay witness, he will not be required to satisfy the standard for offering expert testimony.

A party will not be permitted to evade the strictures of Federal Rule of Civil Procedure Rule 26, essentially presenting a "surprise" expert witness cloaked as a lay witness. See Elcock v. Kmart Corp., 233 F.3d 734 (3d Cir. 2000). Before an expert witness may offer an opinion, pursuant to Rule 702, he must first be qualified by virtue of specialized expertise. Id. Federal Rule of Civil Procedure 26 and Federal Rules of Evidence 702 and 703 function not only to facilitate judicial efficiency, but also to ensure each party is given sufficient notice of an anticipated expert witness.

Under Rule 702, there are three substantive restrictions on expert testimony: relevance, reliability, and helpfulness to the trier of fact's evaluation of such evidence. See In re Paoli R.R. Yard PCB Litig., 35 F.3d at 741 (3d Cir. 1994). An effort to introduce Mr. Jacob's testimony as expert testimony raises the same issues as admitting the testimony as qualified lay witness testimony. There is a dearth of support for the legal and scientific conclusions that Mr. Jacob draws. There is no evidence in the record that Mr. Jacob complied with the testing conditions required in the '229 patent or how he reached other conclusions made in his declarations.

This Court therefore finds that Mr. Jacob's testimony regarding the exchange of correspondence and his retention in anticipation of this litigation are admissible, and therefore, denies, in part, FastCap's motion to strike the same testimony. FastCap's motion to strike is granted as to Mr. Jacob's scientific and legal conclusions because EdgeCo. failed to provide sufficient evidence that Mr. Jacob qualifies as an expert or lay witness with the requisite

specialized knowledge.  The conclusions Mr. Jacob draws are unsupported by the record and

FastCap was not given proper notice regarding the scope of Mr. Jacob's testimony on these

matters.

## CONCLUSION

Summary judgment is appropriate where the moving party establishes that "there is no

genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law."

FED. R. CIV. P. 56(c).  This Court finds that no genuine issue of material fact remains in dispute;

claims 13-16 of the '229 patent are valid and therefore, this Court grants FastCap's motion for

partial summary judgment on validity and denies EdgeCo.'s motion for partial summary

judgment that the same claims are invalid as anticipated and obvious.  This Court concludes that

EdgeCo. teaches each of the limitations of the '229 patent and EdgeCo. thereby infringes the

'229 patent, and therefore, this Court denies EdgeCo.'s motion for partial summary judgment of

non-infringement of claims 1-11 and grants FastCap's motion for summary judgment of

infringement of claim 13 of the '229 patent.  Finally, as set forth above, this Court grants in part

and denies in part FastCap's motion to strike the testimony of Arthur Jacob, Esq.


 S/Joseph A. Greenaway, Jr.
JOSEPH A. GREENAWAY, JR., U.S.D.J.

Dated: July   8th  , 2005

43